Brown, Brothers & Co. *v.* Freeland & Murdock.

34  181
74  622

## BROWN, BROTHERS & CO. *v.* FREELAND & MURDOCK.

1. CONFLICT OF LAWS: LEX LOCI GOVERNS AS TO VALIDITY OF CONTRACT.—A contract, as to its nature, construction, and validity, is governed by the law of the place where it is entered into.

2. SAME: LEX SOLUTIONIS GOVERNS, WHEN: PRESUMPTION ON THIS SUBJECT.— Where a contract is made in one country, to be performed in another, the law presumes, in the absence of any other circumstance, that the parties contracted with reference to the law of the place where it is to be performed; and, in that case, the contract, as to its nature, construction, and validity, will be governed by the *lex loci solutionis*. But this is a mere presumption of law, and is not inflexible; and it will not control, if the attendant circumstances show that the parties contracted with reference to the law of the place where the contract was entered into.

3. SAME: LEX LOCI GOVERNS WHERE THE CONTRACT VIOLATES THE LEX SOLUTIONIS.—Where a contract, made in one country, to be performed in another, stipulates for the payment of a rate of interest allowable by the *lex loci contractus*, but prohibited by the *lex loci solutionis*, it will be governed by the law of the place where it was entered into. For, as it was competent for the parties to contract with reference to the law of either place, it will be presumed that they contracted with reference to that law which their contract did not violate. A presumption will never be indulged that a contract is in violation of law, when it is capable of any other reasonable construction. See *Depau v. Humphreys*, 8 Mart. (La.) R. 1.

APPEAL from the District Chancery Court, at Natchez. Hon. B. C. Buckley, vice-chancellor.

The original bill in this cause was filed by the appellants against Murdock & Freeland, for the purpose of compelling said Murdock & Freeland to apply assets in their hands, as trustees of the

Commercial Bank of Rodney, to the payment of a debt alleged to be due by the bank to the complainants. A demurrer was sustained to this bill, and afterwards the complainants filed their amended bill against Murdock, surviving trustee,—said Freeland, in the meantime, having died.

This amended bill in substance alleged, that the Commercial Bank of Rodney, on the 30th day of June, A.D. 1840, was indebted to the complainants in the sum of £35,137 17s. and 3d. sterling, due and payable in the city of London, for moneys paid by them, to take up the sterling bonds of said bank, payable in London, and for commissions and interest, &c.; and which said bonds were then overdue; that this sterling debt was reduced to federal money, and made payable to the complainants in the city of New York, and the amount of said debt, at the date aforesaid, "was by said Commercial Bank of Rodney, in consideration of said transfer of said debt from sterling to federal money payable in New York, and of their being indulged by complainants, and time given for payment, although said debt was then past due, agreed with complainants, to allow and pay to them interest on said debt at the rate of eight per cent. per annum until paid." And the complainants referred to the letter of J. Lawton, cashier of the bank, as an exhibit, and made it a part of their bill.

The bill then alleges that, on the 23d day of March, 1843, the bank assigned all their assets to the defendants, Freeland & Murdock, in trust, to collect the same, and appropriate them to the payment of the debts of the bank, and that the complainants had assented to the same.

The bill further states that the trustees had made payments on the debt, until it was reduced to the sum of $90,000, but that they now refuse to pay anything more, although there are assets in their hands sufficient to pay the same.

The letter of Lawton referred to is as follows :—

"COMMERCIAL BANK OF RODNEY, December 11, 1840.
"MESSRS. BROWN, BROTHERS & CO.

"Dear Sirs: I am in receipt of your favor of the 20th ult., covering Liverpool news to the 4th November, and the account current of your Liverpool house with this bank to 30th June, 1840.

By the latter we have adjusted our books, showing a balance due Brown, Shipley & Co., on the 30th June, 1840, of £35,137 17s. 3d. in England, or $156,168 28 in New York, with current exchange, which we are willing to fix at 8⅜ c.

" As we cannot see the propriety of placing this balance to your credit in New York on the 1st June, with addition of £293 12s. 4d. for transmission, we have not transferred the balance from the Liverpool house, and shall await your further explanation.

" The bank is willing to admit its indebtedness as first above stated, which, according to our way of calculating, with the 8⅜ ex. add $13,079 09, and create a credit to your account of $169,247 37, on the 30th June, 1840, to bear interest at 8 per cent. per annum until paid.   This, we think, is all that can reasonably be expected, and is, in fact, more than we can see any way of paying at present.   *   *   *   *   *   *

"J. LAWTON, Cash."

Murdock, the surviving trustee, demurred to the amended bill, and for cause assigned :—

1st. That the bonds alleged to have been taken up by complainants by an advance of money, are shown to have been issued to complainants, and are not shown ever to have been in circulation.

2d. The contract on which the suit is brought for the payment of the debt in federal money in New York, with interest at eight per cent., was usurious, illegal, and void.   And

3d. The amended bill is otherwise uncertain, informal, and insufficient.

The vice-chancellor sustained the demurrer, and dismissed the amended bill, and the complainants appealed.

*H. S. Eustis*, for appellants.

The demurrer admits that there was a valid debt due on balance of account to appellants, but objects that the agreement to forbear that debt at eight per cent. is usury under the law of New York, where the balance of account was due, being the domicile of the creditor.

. 1st. It was clearly error to dismiss the bill, if any part of appellants' claim was unaffected by the supposed usury.   Now, the debt

due for balance of account was clearly unaffected by the new contract for delay, charged to be usurious. All the authorities agree; but we quote from Parsons as the latest: " If any subsequent contract in payment of the first be usurious, this second contract will be void, and will therefore leave the original contract or *debt* wholly unpaid, and it may be enforced as if the second had not been made." 2 Parsons on Cont. 392; *Pollard* v. *Schoby,* Cro. Eliz. 20; *Ferrall* v. *Shaen,* 1 Saund. 294; *Nichols* v. *Lee,* 3 Anstr. 940; *Gale* v. *Eastman,* 7 Metcalf, 16. The new contract only affecting the new agreement for interest to be paid for delay, we were turned out of court with our principal unpaid. We are entitled by this same bill to a decree for principal and legal interest. ·

2d. Neither a corporation nor its representatives can *interpose* this defence in New York. They stand as if there could be no such thing as usury under the laws of New York. Laws of 1850. In the case of *Curtis* v. *Leavitt,* 17 Barbour, 311, 15 U. S. Dig. p. 553, a receiver was prohibited from interposing this defence. Of course, the assignee has no power or privilege denied to his principal. ·

. 3d. Our clients want what the law will allow them. We challenge the production of a solitary decided case in which the rate of interest allowed by the law of the State in which the promise is made, has been declared void because that rate of interest exceeded the rate allowed in the State where it is payable. Judge Story labors through twenty pages of his Conflict of Laws to prove from civil law writers that the rate of interest *must* in all cases conform to that of the State where the debt is payable; that it cannot exceed it, even though stipulated; and then concludes his reasoning with this most inconsistent proviso, namely, that it be not a contrivance to evade the usury laws of the State where the promise is actually made. Story, Conflict of Laws, § 304 a, last edition.

If the rule were *imperative,* if the rate of interest *must* conform to that of the State where payable, to prove which is the whole aim of Judge Story's argument, what matter is it how low the rate of interest may be in the State where the note is made ? I understand his argument to be this: making a note payable in a given place is *to him* conclusive evidence that the parties contracting agreed that the contract should be governed by the laws of that

Brown, Brothers & Co. *v.* Freeland & Murdock.

place. But if you can prove *aliunde* that they did not so agree, then we may apply the law of the place where the contract was really made, and find it to be a usurious contrivance. This is yielding all we require. It admits that, after all, the real question is, what law had the parties in view when they contracted? We ask that if there is in the case at bar any ambiguity, that the contract be viewed *in mitiori sensu*. We contracted for eight per cent. Eight was the rate at the domicile of the debtor. The debt was not created in New York; not a dollar was advanced there. When the sterling debt was converted into federal money, it became a debt due in the United States. In what part of it? There where it was liable to be collected, at the domicile of the debtor. If this be true, the debt was running at eight per cent. under the law of Mississippi without stipulation. That the parties stipulated for eight per cent. is *evidence* that they had in view the law of the domicile of the debtor, and negatives any presumption that they designed to violate the laws of New York.

Our view of the case is sustained by every judge who has reviewed the decision of Judge Martin in *Depau* v. *Humphreys*, 20 Martin, 1, except Judge Story. Judge Walworth, in 6 Paige, 631; Judge Redfield, *Peck* v. *Mayo*, 14 Verm. 33; *Hanrich* v. *Andrews*, 9 Porter, 1; Chancellor Kent, 2 Com. 453, 462; 2 Parsons on Contracts, 96; *Pratt* v. *Adams*, 7 Paige, 632; Blydenburg on Usury, 27, 82.

But is it not true that there is a still broader ground than any mentioned, which saves the principal of this debt in this case? The law of New York, which forfeits the principal, by declaring the debt void for usury, is a penal law.

The forfeiture is in the nature of a penalty. Now, whilst it is true that a contract void under New York laws, would be declared void here if *actually* made in the State whose laws are violated, it is equally true that, inasmuch as penal laws are construed strictly, no fiction of law can bring parties within the letter or spirit of the act. You cannot violate a penal law of New York by an act done in Mississippi: such acts are of local jurisdiction; from which it follows, that contracts actually made in Mississippi, can, by the operation of this fiction, forfeit the principal. Our law affects only the interest. Supposing that usury, by construction, is com-

mitted in an agreement made in Mississippi, to be performed in New York, you cannot apply the penal law of New York; you have to resort to the remedial law of Mississippi, which affects only the interest, thus leaving the principal of the debt subject to be decreed to the complainant. *Taylor* v. *Matchell*, 1 How. (Miss.) 596; Smith on Constitutional Construction, 854; 7 Metcalf, 16; *Randall* v. *Renssalaer*, 1 John. R. 93.

The law will not infer a corrupt agreement. *Bank of United States* v. *Waggener*, 9 Peters, 399.

By penal statutes, strictly speaking, are meant not only such as impose a penalty or forfeiture on such as transgress the provisions therein contained, but also such as give a summary remedy in derogation of the common law, or in derogation of the rights of property, or one which takes away the estate of the citizen, or imposes disabilities upon persons.

It is a fundamental rule, that no man shall incur a penalty, unless the act which subjects him to it is clearly within both the letter and spirit of the statute imposing the penalty. Smith on Constitutional Construction, 839.

No court ought to conjecture that an act not expressly forbidden, and which is in itself innocent, might be a preliminary step to a violation of the law, and ought, therefore, to be punished, for the purpose of effecting the legislative intention. Ib. 841.

If the court finds that the New York statute against usury is purely *remedial*, its repeal as to corporations is conclusive against them. *Cole* v. *Savage*, cited in Smith's Constitutional Law, 852.

*J. Winchester*, on same side.

No memorandum of Mr. Winchester's argument has come to the possession of the reporter.

*H. T. Ellett*, for appellee.

We make no question, at present, as to the rights of the complainants to recover, upon a proper bill, the amount really due them, if anything; but we object to any recovery in the present form of this bill, or on the contract therein stated, as the ground of their claim.

I. As to the form of the bill, we insist that it ought to be framed on behalf of all other creditors of the bank, interested in the fund.

The authorities on this point are conclusive. 1 Story Eq. Pl., sec. 99, 100, 101.

The fund in the hands of the appellee is a trust fund, for the equal benefit of all the creditors of the Rodney Bank; and it is evident that the complainants cannot have a decree for any portion of the fund without making all the other creditors parties, or giving them an opportunity to become so.

II. We insist that the contract stated in the bill, and upon which a recovery is sought, is illegal, and absolutely void, on account of *usury*.

The bill shows that the complainants had two firms, one at Liverpool, under the name of W. & J. Brown & Co., and afterwards of Brown, Shipley & Co., and the other at New York, under the name of Brown, Brothers & Co. That the Rodney Bank made certain bonds to the Liverpool house, payable in London. It does not appear that these bonds were ever put in circulation, or were ever indorsed by the complainants, or that they received them from the bank for a consideration. It is merely alleged that the bank was indebted to them in a certain sum, in sterling money, paid by them in London, to take up the bonds thus issued in their favor; and it is not averred that they were under any liability to pay, or that they paid at the request of the bank.

But, conceding that the payment was made under such circumstances as to give them a legal claim against the bank for reimbursement, then it was a debt to the house of W. & J. Brown & Co., of Liverpool, and was contracted in England, and payable there, and bore interest at five per cent., if it bore interest at all; for it is well settled that the debt is due and payable at the place where the advances are made. Story's Confl. Laws, 235, sec. 283, 284, a; 238, sec. 287; 265, sec. 319; *Lanusse* v. *Barker*, 3 Wheat. 101, 147; *Consequa* v. *Fanning*, 3 John. Ch. R. 587, 610; 20 John. R. 102; *Lizardi* v. *Cohen*, 3 Gill, 430; *Coolidge* v. *Poor*, 15 Mass. 427; *Boyle* v. *Zacharie*, 6 Peters, 635, 643; *Lewis* v. *Owen*, 4 Barn. & Ald. 654; 6 Eng. Com. Law Rep. 557.

We say, "if it bore any interest at all," for, by the 3d and 4th Will. IV, interest is only allowed on such demands from the time

of demand of payment made in writing, with express notice to the debtor that interest will be required if the money is not paid; and even then it is at the discretion of the jury to give interest or not. Chitty on Cont., 8th ed. 557.

The bill alleges that this sterling debt was reduced to federal money, and made payable in New York; and that the bank, in consideration of the transfer of the debt from sterling to federal money, payable in New York, and of their being indulged and time given for payment, although the debt was then past due, agreed to pay the money in New York, with interest at eight per cent.

Waiving, for the present, all question as to the sufficiency of the consideration, and as to the form and evidence of this new contract, which is the foundation of the amended bill, we insist that its validity is to be determined by the law of New York; and that, by the law of that State, this agreement was usurious, unlawful, and absolutely void.

The interest of New York is seven per cent., and the effect of contracting for more than the legal rate is that the contract is entirely void. *Dunham* v. *Dey*, 13 Johns. 45; *Jackson* v. *Henry*, 10 Johns. 185; *Andrews* v. *Pond*, 13 Peters, 77.

The court will take notice of the law of New York without proof. Rev. Code, 516, Art. 226.

If the validity of the contract depends upon the law of New York, it is, therefore, clearly void.

It will not be denied that, if this contract, which was to be performed in New York, is also to be regarded as having been made there, the law of that State would govern.

For, generally speaking, the validity of a contract is to be decided by the law of the place where it is made. If valid there, it is valid everywhere; if void or illegal there, it is void or illegal everywhere. Story, Confl. Laws, 201, sec. 242, 243; 2 Kent Com. 457, 458.

Where, then, was this contract made? It is remarkable that the amended bill is wholly silent on this important point; but, applying settled principles to the case as disclosed, we contend that the contract must be considered as made in New York. One of the parties was a corporation located at Rodney, Mississippi, and the other a commercial firm, having a place of business in New

York. The transaction appears to have been conducted by correspondence. But one letter of the whole series is exhibited, from which it is shown that on the part of complainants, it was conducted by the New York house. This letter purports to be a reply to a proposition presented by complainants, which the bank rejects, and submits a counter proposition. It offers to credit the New York house with the federal value of the sterling debt, with 8⅜ per cent. added for exchange, and 8 per cent. interest in New York, rejects the charge for the transfer, and waits further explanation. This letter made no contract between the parties. It required the *act of acceptance*, the *assent* of the other party. *The moment* that assent was given, there was a contract between the parties. *Then* there were two agreeing minds. That assent was given in New York, if given at all; and there, in New York, what before was a proposition by one party to the other, became a contract between the parties. Chitty on Con. 8 ed. 9 to 15.

It has already been shown that where advances are made, the locality of the contract is at the place where the money is advanced, and not at the domicile of the debtor.

Judge Martin says : " Contracts are made in the country, and subject to its laws, *where the final assent is given :* as a merchant who receives and executes the orders of a correspondent." *Depau* v. *Humphrey*, 20 Martin, 1 (8, New Series) ; 4 Cond. La. Rep. 403, 411 ; *Whiston* v. *Stodder*, 8 Martin (4, New Series 48), 93 ; 2 Kent Com. 459, note b; Story Confl. 237, s. 285.

The contract is made at the place *where it is assented to.* *McIntyre* v. *Parks*, 3 Metcalf, 207 ; Chitty on Con. 12, note 2.

So, where the parties do not reside in the place where the contract is made, and it is effected by means of agents or letters, the place in which the *final assent* is given by the party to whom the proposition was made, is that in which the contract is considered to have been made. Burge on Surety, 75, 78, cited by counsel in *Brown* v. *Nevitt*, 27 Miss. 801.

And again, " In the absence of direct evidence as to the place where the contract was made, or the money advanced, or the papers delivered, the presumption of law is, that the contract was made at the place where the person lives who is to receive the payment, or

where the contract was to be performed." *Varick* v. *Crane*, 3 Green's N. J. Chan. 133; 2 Paige, 604.

It is clear, then, from reason and authority, that the place where the negotiation ripened into a contract,—the place where the *consenting minds first met*,—is the place where the contract was made; and as this, in the present case, must have been at New York, there-fore this contract was made in New York, and was to be performed there.

If this view is correct, it disposes of the case.

But we do not stop here.   And conceding, for the sake of the argument, that the contract *was made in Mississippi*, for the pay-ment of the money in New York, and that by the law of Mississippi, a contract for 8 per cent. interest was perfectly valid, yet we contend that, in that case, the validity of this contract is to be determined wholly by the law of New York, where the money was to be paid, and not by the law of Mississippi, where the contract is supposed to have been made.

The American text-books state the principle very clearly.   Kent says: " But if a contract be made under one government, and is to be performed under another, and the parties had in view the law of such other country in reference to the execution of the contract, the general rule is, that the contract, *in respect to its construction and force*, is to be governed by the law of the State or country *in which it is to be executed.*"   2 Kent Com. Lec. 39, p. 459.

Story says: " But where the contract, is either expressly or tacitly, to be performed in any other place (than that where it is made), there the general rule is, in conformity to the presumed intention of the parties, that the contract, as to its *validity, nature, obligation*, and *interpretation*, is to be governed by the law *of the place of performance.*"   Story, Conflict of Laws, 233, sec. 280.

And he quotes the rule of the civil law, *"contraxisse unusquisque in eo loco intelligitur, in quo, ut solveret, se obligavit."*   Dig. Lib. 21; Story, Conf. L. 194, sec. 233; 233, sec. 280; Ib. 250, sec. 301, a, 302; 250, sec. 304.

The adjudged cases in support of this doctrine are numerous.

Lord Mansfield, in a case founded on a bill of exchange given in France, payable in England, the consideration of which was money won and lent at play, said: " There are three reasons why the

party cannot recover here upon this bill of exchange: 1st. The parties had a view to the laws of England. The law of the place can never be the rule, where the transaction is entered into with an express view to the law of another country, as the rule by which it is to be governed." Cites Huberus and Voet, and says: "Now here the payment is to be in England; it is an English security, and so intended by the parties." *Robinson* v. *Bland*, 2 Burrows, 1077.

There is also a report of this case in 1 Wm. Blackstone's Rep. 234, 256; where the points decided are more clearly stated.

Mansfield says (p. 258), " The general rule established *ex comitate et jure gentium*, is that the place where the contract is made, and not where the action is brought, is to be considered, in *expounding and enforcing* the contract. But this rule admits of an exception, where the parties, at the time of making the contract, had a view to a different kingdom." Huberus says, Prœl. 1, tit. 3, p. 34, "Contracts are to be considered according to the place wherein they are to be executed." As, therefore, the bill in the present case is made payable in England, it is entirely an English transaction, and to be governed by the local laws. This stands upon the same ground, as that landed property must be governed by the local law.

Denison, J., said (p. 261), " It is a plain case, and must be ruled by the laws of England."

Wilmot, J., said (p. 262), " The place where the money is to be paid must guide the law. It is so determined as to usurious contracts in Ireland. Pr. Chan. 128. Clearly, therefore, the law of England must be the rule, *as the money was made payable here.*"

This point was directly involved. The very first question was, By what law is the validity of this bill of exchange to be determined, and what is the character of the contract when tested by that law? What Lord Mansfield said is, therefore, not an *obiter dictum*. For he first lays down the true rule by which the validity of the contract was to be tried, to wit, the law of the place of performance, though he afterwards proceeds to say, that if this were not so, there could still be no question in the case, "for the law of both countries is the same."

In *Rothschild* v. *Currie*, 1 Adolph & Ellis, N. S. 43 (41 Eng. Com. L. Rep.), which was an action by indorsee against indorser

Brown, Brothers & Co. v. Freeland & Murdock.

of a bill drawn and indorsed in England, payable in France, Lord Denman treats the law of France as the *lex loci contractus*, and says, "This bill being payable in France is a foreign bill, and although actually made in England, must be taken as between the drawer and payee, *to have been made in France*, according to the principle embodied in the civil law maxim,—*contraxisse unusquisque in eo loco intelligitur, in quo ut solveret se obligavit.*" And he says this is equally true between the indorser and indorsee.

In *Andrews* v. *Pond*, 13 Peters, 78, Chief Justice Taney, in reference to the question whether the contract was void for usury, says, "The general principle in relation to contracts made in one place, to be executed in another, is well settled. They are to be governed by the law of the place of performance, and if the interest allowed by the laws of the place of performance is higher than that permitted at the place of the contract, the parties may stipulate for the higher interest."

It is a necessary inference from this, that if the interest of the place of performance is *lower* than at the place of contract, the law of the place of performance must be conformed to.

The same principle is asserted in *Musson* v. *Lake*, 4 How. U. S. 278.

In *Blanchard* v. *Russell*, 13 Mass. 4, C. J. Parker says, "It is now a principle generally received, that contracts are to be *construed* and *interpreted* according to the laws of the State in which they are made, unless from their tenor it is perceived that *they were entered into with a view to the laws of some other State.*"

And in *Prentiss* v. *Savage*, Ib. 23, the same judge lays down very clearly the same rule, and more explicitly says, that when *made with a view to performance in some other country, the law of such country is to prevail;* and states that it is the presumed intent of the parties "to take into their consideration the law of such foreign country."

In New York, the doctrine laid down by Mansfield, in *Robinson* v. *Bland*, is approved and followed. *Smith* v. *Smith*, 2 Johns. 235; *Ruggles* v. *Keeler*, 3 Johns. 263; *Thompson* v. *Ketcham*, 4 Johns. 285; 8 Johns. 189; *Sherrill* v. *Hopkins*, 1 Cowan, 103; *Vanschaick* v. *Edwards*, 2 Johns. Cas. 355; *Hyde* v. *Goodnow*, 3 Comstock, 266; *Andrews* v. *Herriot*, 4 Cowan, 508.

In this latter case, a very valuable note is added by the reporter,

summing up the law, and citing the authorities, on various questions of the application of foreign law.   In reference to the point now under consideration, he says that the law of the place where a contract is made, *or to be performed*, is to govern as to the *nature, validity, construction,* and *effect* of it, and cites numerous cases (p. 511), and on page 513 he gives many decisions showing that the law *of the place of performance* is to govern.

The cases of *Van Reimsdyk* v. *Kane*, 1 Gallison, 374, and *Le Roy* v. *Crowninshield*, 2 Mason, 150, 157, decided by Judge Story, deserve especial notice.   *Fanning* v. *Consequa*, 17 Johns. 511, 518, *Pope* v. *Nickerson*, 3 Story Rep. 465, are also fully to the point.

There are many cases in other States where the doctrine is fully recognized that the validity, effect, and construction of contracts, depend upon the law of the place of performance.   *Roe* v. *Jerome*, 18 Conn. 138; *Goddin* v. *Shipley*, 7 B. Monroe, 575; *Brodhead* v. *Noyes*, 9 Missouri, 56; *Dorsey* v. *Hardesty*, Ib. 157; *Sherman* v. *Gassett*, 4 Gilmer, 521; *Tyler* v. *Trabue*, 8 B. Monroe, 306; *Bainbridge* v. *Wilcox*, 1 Baldw. 536; *McCandlish* v. *Cruger*, 2 Bay, 377; *Bank of Orange* v. *Colby*, 12 N. Hamp. 520; *Dow* v. *Russell*, 12 Ib. 49; *Titus* v. *Scantling*, 4 Blackf. 89; *Hatcher* v. *McMorine*, 4 Dev. 122; 3 Ib. 161; *Rowell* v. *Buck*, 14 Vermont, 147; *Carnegie* v. *Morrison*, 2 Metc. 394, *et seq.; De Sobry* v. *De Laistre*, 2 Harr. & John. 191; *Pryor* v. *Wright*, 14 Ark. 189; *Andrews* v. *Hoxie*, 5 Texas, 171.

Story says this question often arises in cases respecting the payment of interest.   The general rule is, that interest is to be paid on contracts according to the law of the place where they are to be performed, in all cases where interest *is expressly* or impliedly to be paid.   If payable in a foreign country, loans may bear any rate of interest not exceeding that which is lawful by the laws of that country. Story, Confl. Laws, 241, sec. 291; 243, sec. 292. The question, whether a contract is usurious or not, depends upon the validity of the interest allowed in the country where the contract is made *and to be executed;* but, if the place of payment, or of performance, is different from that of the contract, then the interest may be validly contracted for, at any rate not exceeding that which

is allowed in the place of payment or of performance.   Ib. 246, sec. 296 ; 2 Kent, 461, note c.

The rule, that interest is to be allowed according to the law of the place of the contract, or of the place of performance, when it is to be performed elsewhere, is recognized in many American cases. 1 Nott & McCord, 67, 173 ; *Hanrick* v. *Andrews*, 9 Porter, 9 ; *Von Hemert* v. *Porter*, 11 Metc. 210 ; *Fanning* v. *Consequa*, 3 Johns. C. R. 610 ; *Scofield et al.* v. *Day et al.*, 20 Johns. 102 ; *Hosford* v. *Nicolls*, 1 Paige C. R. 225 ; 2 Kent, 459, 461, and notes ; *Andrews* v. *Pond*, 13 Peters.

The same rule is admitted in England.   *Thompson* v. *Powles*, 2 Sim. 194, 211 (2 Eng. Chan. R.) ; *Cooper* v. *Earl of Waldegrave*, 2 Beaven, 242 (17 Eng. Ch.) ; *Auriol* v. *Thomas*, 2 T. R. 53 ; *Bodily* v. *Bellamy*, 2 Burr. 1094 ; *Arnott* v. *Redfern*, 2 Carr. & P. 88 (12 Eng. C. L. R. 39) ; *Ekins* v. *East India Co.*, 1 Peere Wms. 395 ; *Harvey* v. *Archbold*, Ryan & M. 184 (21 Eng. C. L. R. 413) ; *De Warr* v. *Spann*, 3 T. R. 425 ; *Robinson* v. *Bland*, 2 Burr. 1077 ; *De Lavega* v. *Vianna*, 1 Barn. & Ad. 284 (20 Eng. C. L. R. 387) ; *B. Linen Co.* v. *Drummond*, 10 Barn. & C. 903 (21 Eng. C. L. R. 194) ; *Trimbey* v. *Vignier*, 1 Bing. N. C. 151 (27 Eng. C. L. R. 336) ; *Huber* v. *Steiner*, 2 Bing. N. C. 202 (29 Eng. C. L. R. 311).

But this laborious collation of authorities was hardly necessary, when the point is fully settled by the repeated adjudications of this court.

In a suit founded on a note made in Mississippi, payable in Louisiana, with interest at ten per cent., the court say : " The first question presented for decision is, what law is to govern this contract ?   The answer is, the law of the place where by its terms it is to be performed, which, in this instance, is Louisiana."   Citing the passages from Story and Kent, already quoted. *Martin, Aikin & Co.* v. *Martin, Pleasants & Co.*, 1 S. & M. 176.

The very question involved in this case, was involved in that, to wit, when a contract is made in one State, to be performed in another, by what law is the question to be determined, whether or not it is a usurious contract ?   And the decision is, not the law of the place of contract, but the law of the place of payment or performance.

The same point precisely, arose in *Robb* v. *Halsey*, 11 S. & M. 140, 147, and was ruled the same way.

And the same doctrine is recognized in *Brown* v. *Nevitt*, 27 Miss. (5 Cushm.) 801, 820.

Other cases have been decided in which the rule, that the validity, construction, and effect of a contract, are determined by the law of the place of the performance, was admitted. Thus, in *Frazier* v. *Warfield*, 9 S. & M. 228, it was decided that the liability of the acceptor of a bill is governed by the law of the place where the contract is to be performed. And in *Fellows et al.* v. *Harris*, 12 S. & M. 462, 468, it is ruled that a bill drawn in this State, but payable in Louisiana, is not governed by our State legislation respecting defences and set-off, but by the general principles of commercial law. And in *Lyon* v. *Knott*, 26 Miss. 564 (4 Cush.), "the well-understood rule of the common law, that the law of the place where contracts are entered into, *unless they are made with reference to performance in another place*, is to regulate and determine the relative rights and obligations of the parties," is spoken of. And see *Dalton* v. *Murphy*, 20 Miss. 59, 65. Fisher, J.

Nor would such labor have been attempted, but for the existence of some decisions of State courts, relied on with apparent confidence by the opposite side, wherein different principles have been established, and different conclusions reached.

The first of these in importance, is the case of *Depau* v. *Humphreys*, 20 Martin, La. (8 N. S.) 1 ; (4 Cond. La. Rep. 403).

Judge Martin, in this case, says (and this is the result of his opinion), "that there are two *loci contractus,—locus celebrati contractus, locus solutionis.*" And that the distinction as to the parts of a contract which are to be governed by the law of the place in which it is entered into, and those which are to be governed by the laws of the place in which the payment was intended, is well marked.

In the first class is included whatever relates to the form and perfection of the contract, and all the ceremonies and formalities attending it. In the same class are next to be placed all matters resulting from the nature of the contract, or immediately therefrom.

As to what concerns the performance of the obligation,—the

payment of the sum, the delivery of the thing, presentation of bills of exchange, acceptance, days of grace, protest, weight, measures, damages arising from negligence or delay, the *locus destinatæ solutionis* is to be considered."

Unless Judge Martin means to refer the *validity* of a contract to the *form and perfection* of it, it is not easy to tell from this "well-marked distinction" where he would confine the question of validity. But toward the close of his opinion he becomes quite explicit, and says, " Contracts are governed by the law of the country in which they are made, in everything which relates to the mode of construing them, the meaning to be attached to the expressions by which the parties bound themselves, and the nature *and validity* of the engagement. But that, wherever the obligation be contracted, the *performance* must be according to the law of the *place where it is to take place.* In other words, that in a note executed here, on a loan of money made here, the creditor may stipulate for the legal rate of conventional interest authorized by our law, although such a rate be disallowed in the place at which payment is to be made."

This is a plain denial that there is any difference in respect to the *construction and validity* of a contract, between such as are to be performed at the place where they are made, and those to be performed in other countries. But it asserts that in all cases, the validity and construction depend exclusively upon the law of the place where they are made, leaving nothing but the *mode of performance* to be regulated by that of the place where performance is to be made.

It follows that had the note in *Depau* v. *Humphreys* been made in New York, payable in New Orleans, with ten per cent. interest, it would have been void in New Orleans, though the parties contracted with express reference to the law of Louisiana, and in strict accordance with it.

It is not even as Judge Story expresses it, that the law of *both* States is not violated (Confl. Laws, 248, sec. 298), but the case goes entirely on the ground of the law of the place *celebrati contractus.*

Judge Story, in his Conflict of Laws, 247, sec. 298, to 253, sec. 307, has given to this case a critical examination, and shows that the continental writers, cited by Judge Martin, do not sustain

his conclusions, and indeed that some of them are mistranslated. This review is referred to, as nothing can be added to it.

The case is in direct conflict with the decisions in *Martin, Aikin & Co.* v. *Martin, Pleasants & Co.*, and *Robb & Halsey.* It was made in 1829, long before our decisions. Judge Story's book, containing his observations on this case, was before our court, and his doctrine adopted, rather than that of Judge Martin.

It is also at variance with the opinion of the Supreme Court of the United States in *Andrews* v. *Pond,* and with the numerous decisions of other States already cited to show that the *validity and construction* of a contract must be according to the law of the place of performance, and it is also in conflict with Lord Mansfield's judgment in *Robinson* v. *Bland,* and Lord Denman's in *Rothschild* v. *Currie.*

It is at least in seeming conflict with the ruling of the same court in *Baldwin* v. *Gray,* 16 Martin (4 N. S.) 192 (3 Cond. La. Rep. 269), where it was admitted that a contract must be governed by the law of the place of performance.

It is undoubtedly true that the law of the place of the contract must control in respect to the *formalities and ceremonies* to be observed, and in all things essential to the *making of a contract.* But Judge Martin has drawn this distinction inaccurately.

Story says (Confl. Laws, 215 to 219, sec. 260 to 262, a), "that all the formalities, proofs, or authentications of them (contracts), which are required by the *lex loci,* are indispensable to their validity everywhere else."

Kent says (2 Com. 459, note 1): "Every contract must conform to the formalities and solemnities required by the *lex loci,* in respect to their valid execution."

Judge Martin asks: "If the law of the place of performance governs, of what use is it then for the legislature to pass laws for the protection of the weak and necessitous?" instancing infants.

According to the case of *Saul* v. *His Creditors,* 17 Martin, 569, 5 N. S. (3 Cond. La. Rep. 663, 674), this is not a very important inquiry, for the courts of that State hold to whatever rule will benefit its own citizens. Thus, if a person of age at the place of his domicile, but not of age by the law of Louisiana, comes to that State and makes a contract, he is bound, for *the law of his*

*domicile* regulates his capacity; but if a person not of age by the *law of his domicile*, but of age by the law of Louisiana, comes there and contracts, he is bound, for the law of *the place of contract* then governs. See Story's remarks on this case, Confl. Laws, 73, sec. 75, to 74, sec. 76.

Story fully discusses this question of the *capacity of persons*, in his fourth chapter, and at p. 86, sec. 102, concludes that, generally, the law of the place of contract is to govern. Also p. 253, sec. 306.

And this is easily reconciled to principle; for, whatever relates to the form and perfection of the contract, is referred to the law of the place where it is made. To give rise to any question of conflict, there must be a *contract made*. Now no contract is *made*, unless, at the place where made, there were *parties able to contract*, and *willing to contract*. Two consenting minds must concur at one place and time, to make a contract. If either party was *unable* to contract from infancy, coverture, unsoundness of mind, or other cause, then there was no contract. The "forms and ceremonies" required by the local law were not present.

Story says, however, that it is not easy to decide which would be the most convenient rule (p. 74, sec. 76); and that any country can adopt whatever rule it chooses (p. 253, sec. 306). And in view of the entire uniformity that now exists in this country, England, France, and other countries, on the subject of the age of majority, no inconvenience or hardship could follow in any case. And in reference to contracts made in one place to be performed in another, as the parties are supposed to have *actually contracted* at the *place of performance*, as they could always *go there* to make their contract, the rule that the law of the place of performance shall govern, might well be adopted.

Kent (2 Com. 400) quotes the case of *Depau* v. *Humphreys* as sustaining the doctrine, that where a rate of interest is contracted for, which is lawful where the contract is made, but unlawful where the money is to be paid, such interest may be allowed; but he cites it as evidence of the "distinctions and jarring decisions" on the subject, and in note a, he says, "The law of this case has been critically examined by Justice Story (Confl. Laws, 248, 254), and he does not think the foreign jurists bear out the case."

In *Chapman* v. *Robertson*, 6 Paige, 627, 634, Chancellor Wal-

worth expresses his full concurrence with Judge Martin, in the decision in *Depau* v. *Humphreys*. That was a case where the agreement for a loan at seven per cent. interest, was made in England, but the bond and mortgage was executed in New York. No place of payment was stipulated. The Chancellor says (p. 630): "As no place of payment is mentioned, the legal construction of the contract is, that the money is to be paid where the obligee resides, or wherever he may be found. This residence being in England, at the execution of the bond, that must, therefore, be considered the place of payment." And he admits that the contract would be void as against the law of England, but for the fact that the debt is secured by a mortgage on land in New York.

And he says (page 634), the bond and mortgage being executed in New York, though delivered in England, and the money advanced there, "it was a contract partly made in this State, and partly in England. And being actually made in reference to our laws, and to the rate of interest allowed here, it must be governed by them in the construction and effect of the contract as to its validity."

The authority of the whole case is questionable. The contract was wholly made in England, the securities were delivered, and the money advanced there. The fact that the bond and mortgage were signed in New York, did not make it part of a New York contract, for they took effect only on delivery, and they might have been signed before any negotiation was commenced.

And it is adjudged, in many other cases, that a mortgage executed in another State on land there situated, to secure a debt, does not alter the locality of the contract with regard to the rate of interest. *De Wolf* v. *Johnson*, 10 Wheat. 367 (6 Cond. R. 140); *Hosford* v. *Nicholls*, 1 Paige, 220; *Varick* v. *Green*, 3 Green's Ch. R. 128; Story's Confl. Laws, 243, sec. 293; Ib. 258, sec. 287, a.

So it is said by Radcliff, J., in *Van Schaick* v. *Edwards*, 2 Johns. Cas. 360: "The contract is entire and indivisible, and the whole must be subject to the laws of Massachusetts, or of this State. It cannot be divided and controlled by different laws."

It is worthy of remark, that Chancellor Walworth quotes with approbation all that was then contained in Story's book, and is careful to note that neither Story nor Kent had expressed any opinion upon the precise point adjudged in *Depau* v. *Humphreys*.

.This was an error, as a reference to the early editions of Story shows. But, in the subsequent editions, Story has gone more fully into the subject, and has shown that Judge Martin's doctrine cannot be sustained. It is very evident that if Story's more elaborate opinion had been expressed *first*, Walworth's judgment would have been different. But Story, after Walworth had concurred with Martin on the point, differed from them both, and sustained himself by a clear and conclusive argument.

Story states the reasons why this case of *Chapman* v. *Robertson* cannot be sustained on the grounds asserted by Chancellor Walworth. Confl. Laws, 244, sec. 293, c, &c.

The authority of this case, and also that of *Pratt* v. *Adams*, 7 Paige, 632, in which Chancellor Walworth took the same view, is entirely overthrown by the recent decision of the Court of Appeals in New York in *Hyde* v. *Goodnow*, 3 Comstock, 266, in which it is 'expressly held, as the settled law of that State, that where a contract is made in one State, to be performed in another, the parties are presumed to have had reference to the laws of the latter, and that those laws are to be resorted to, to determine the validity, obligation, and effect of the contract.

Another case, perhaps relied on, is that of *Hitchcock* v. *Bank U. S.*, 7 Ala. 386.

Agreement was made in Philadelphia for a loan, to be secured by bond and mortgage on land in Alabama, payable with eight per cent. interest in New York. Agents were sent by the bank to Alabama to close the arrangement, and the securities were executed there. The money was deposited in New York by the bank on receipt of the securities. The contract was held good in Alabama, "there not appearing to have been any actual intention to violate the usury laws of New York."

The case being put on the ground of *intention*, is clearly in violation of settled principles. For "where the contract on its face imports usury, as by an express reservation of more than legal interest, there is no room for presumption. The intent is apparent. *Res ipsa loquitur.*" *Planters' Bank* v. *Snodgrass*, 4 How. 623; *Bank U. S.* v. *Wagner et al.*, 9 Peters, 400; 3 Bos. & Pul. 154; 17 Vesey, Jr. 47; 2 Cowen, 678; 1 Call, 63; 4 Rand. 406, 411.

Another case, and the only other one we have found, sustaining

views different from those which we support, is that of *Peck* v. *Mayo*, 14 Vermont, 33.

That was a suit founded upon notes made in Montreal, Canada, payable at Albany, New York, and the question was what interest they bore after maturity. The court very properly decided that they bore interest by the law of New York. It is admitted in the opinion that the general rule is, that the law of the place of performance is the *governing law of the contract*. And hence, that the elementary principle undoubtedly is, that the rate of interest, *whether stipulated in the contract*, or given by way of damages for the non-performance, is the interest of *the place of payment*.

The court then proceeds to inquire whether there are any established principles in conflict with this view, and, after citing a number of cases, concludes by asserting the following, among other settled rules :—

"If a contract be entered into in one place, to be performed in another, and the rate of interest differ in the two countries, the parties may stipulate for the rate of interest of either; and thus, by their own express contract, determine with reference to the law of which country that incident of the contract shall be decided."

But no case giving the slightest countenance to such a doctrine is cited, except that of *Depau* v. *Humphreys*, already commented upon; and if it be true, as has been shown, that the parties are held to *have made their contract* at the place where they have stipulated *to make the payment*, there can be no good foundation for such a principle.

These cases are certainly at variance with the great preponderance of English and American authority, and are in direct conflict with the rule established by this court.

We, therefore, submit that the decision of the vice-chancellor, dismissing the amended bill on demurrer, was correct, and ought to be affirmed.

*W. S. Wilson*, on same side.

The bill in this case shows a contract for the payment of money in New York, and interest reserved at eight per cent. In the year 1840, when the contract appears to have been made, contracts made in New York reserving a higher rate of interest than seven

per cent. were usurious and void. 1 Rev. Stat. N. Y. 772; *Andrews* v. *Pond*, 13 Peters, 65; *Depau* v. *Humphreys*, 20 Mart. (La. Rep.) 1.

It does not appear clearly, from the statements of the bill, *where* the contract now in question was made. Complainants state that they paid money for the Rodney Bank in London, to take up her bonds, which bore six per cent. interest, and that the bank owed them in London £35,000 sterling on open account. They had two places of business, one in Liverpool, the other in New York. Whether the new agreement, to reduce the debt to federal money, payable in New York, with interest at eight per cent., was made in England, New York, or Mississippi, does not appear. If it was an English contract, and to be governed by English law, it was usurious and void, that law allowing only a reservation of five per cent. If a New York contract, for a like reason, it was void. If it were a Mississippi contract, and to be governed by our law, the stipulated interest did not exceed the lawful rate.

But we insist that it matters not where the contract was actually entered into, because the parties having agreed that it should be performed in New York, had reference to the laws of that State, by which it was to be governed, and its validity determined. Story's Conflict Laws, sect. 280 to 306.

The rule that the law of the place of performance is to govern contracts, would seem to have prevailed from the earliest times, since jurisprudence has been cultivated as a science. Judge Story, at the place cited, Confl. Laws, sec. 280, quotes Justinian's Digest as follows: "Every one is understood to have *contracted in that place* in which he has obliged himself to make payment." And again, the same proposition is expressed negatively: "The contract *is not understood* to be made at the place where the business is transacted, but where the money is to be paid."

Judge Story quotes also from the works of various of the civilians of the continent of Europe to the same effect, some of whom put the very case of a stipulation to pay elsewhere a higher rate of interest than is allowed by the law of the place of performance.

This has been generally understood to be the true rule by the courts of common law in England and this country, and by the writers of our text-books.

In the book referred to, Judge Story's opinion is given unmistakably. Chancellor Kent also says: "If a contract be made under one government, and is to be performed under another, and the parties had in view the laws of such other country in reference to the execution of the contract, the general rule is, that the contract, in respect to its construction and force, is to be governed by the law of the country or State in which it is to be executed." 2 Kent Com. 459.

In *Robinson* v. *Bland*, 2 Burrows, 1077, Lord Mansfield regarded this as the undoubted rule. His language is: "The law of the place can never be the rule, where the transaction is entered into, with an express view to the law of another country, as the rule by which it is to be governed. Now, here the *payment* is to be in England. It is an English security, and so intended by the parties." S. C. 1 Black. Rep. 256.

In like manner has the law in this country been declared by the highest authority.

In *Andrews* v. *Pond*, 13 Peters, 77, Chief Justice Taney says: "The general principle in relation to contracts made in one place to be executed in another is well settled. They are to be governed by the law of the place of performance; and if the interest allowed by the laws of the place of performance is higher than that permitted at the place of the contract, the parties may stipulate for the higher interest without incurring the penalties of usury."

So in *Martin, Aiken & Co.* v. *Martin, Pleasants & Co.*, 1 S. & M. 176, where a note was given in this State, for money payable in New Orleans, at ten per cent. interest, this court said the law of the place of performance was to govern. Although tested by the laws of Mississippi the contract would be usurious, yet that question of usury was to be referred to the laws of Louisiana. The court, almost in so many words, say that if the contract were shown to be usurious by the laws of Louisiana, they would pronounce it to be illegal. (I may remark that this case arose before the statute requiring our courts judicially to notice the laws of other States.) A like decision was made in *Robb* v. *Halsey*, 11 S. & M. 147. And see *Sweet* v. *Dodge*, 4 S. & M. 667; *Henry* v. *Halsey*, 5 S. & M. 576.

For the principle that the law of the place of performance governs, see also 9 S. & M. 220; 12 S. & M. 462.

It is recognized by Judge Smith. *Lyon* v. *Knott*, 26 Miss. Rep. 548. By Judge Handy, *Brown* v. *Nevitt*, 27 Miss. Rep. 820, with the qualification given by Judge Taney, 13 Peters, 77, that the contract payable elsewhere is not in fraud of our own laws. Also 30 Miss. Rep. 64.

So bonds given to the United States for the faithful discharge of their duties by its officers, are to be tried as to their validity and binding effect by the laws of the General Government at Washington, and not by the laws of the States in which they are executed. 6 Peters, 172 ; 7 Peters, 435.

In England, also, it has been held that contracts may lawfully be made in that country, to be performed abroad, and reserving a higher rate of interest than is allowed by the local law. *Thompson* v. *Powles*, 2 Simons, 194 ; *Harby* v. *Archbold*, Ryan & Mood. 184.

Chancellor Kent (2 Com. 460, 461) says, where the contract gives interest specifically, the rate of interest of the place of payment is to govern. *Consequa* v. *Fanning*, 17 John. 511 ; 4 Cowen, 510, 511, and note ; 3 Comstock, N. Y. Ct. Appeals, 269. The law of place of performance governs as to validity of contract.

And is not this doctrine reasonable ? Do not parties, who agree to go to another country to fulfil a contract, tacitly agree to render themselves amenable to its jurisdiction and its laws ? Beyond all doubt, it must be taken to be true as a general axiom, that the laws of every independent State are supreme within its own limits, and that an obligation to obey them rests upon all who enter its dominions. If so, do not all who engage to go from abroad to do any act of necessity refer themselves to the laws of such State, to ascertain whether the act will be permitted or forbidden ?

Again, does not the comity of nations and good neighborhood require, that the courts of one country, whose citizens have stipulated to go to another to perform a contract, shall look into it and see that they have not agreed to violate its laws, or its policy, or to do acts which would be pernicious in their example to its people.

The only case I have been able to see holding a contrary doctrine is that of *Depau* v. *Humphreys* (20 Martin La. Rep. 1), in which it was decided, that a note given in New Orleans, payable in New York, reserving ten per cent. interest, was a good contract, and

that its validity was to be tested by the laws of Louisiana, where it was made.

Chancellor Walworth (6 Paige, 627, and 7 Paige, 632) approves of this decision.

On the other hand, the case has been criticised and reviewed at length by Judge Story, in Confl. Laws, 3d ed. secs. 298–305, and has received his pointed condemnation.

The European writers, on whose authority the decision is mainly rested, have, in the opinion of Judge Story, been misapprehended.

The court, deeming itself borne down by the weight of authority, adopts as the rule which it deduces from them, that the law *loci celebrati contractus* is, in all cases, to determine its validity. The opinion contains but a slight discussion of the general principles involved in the case.

Only one reason of a general nature appears to be assigned as having controlling influence with the court,—which is, that if in the instance the law of New York were allowed to determine the validity of the contract, the converse proposition would be established, that a contract made in Louisiana that would be vicious by its law, would be good if to be performed in New York, whose laws should sanction it.

Now, it so happens that this court, in the cases above cited, acting on the rule that the *lex loci solutionis* governs, has adopted as the law here, that very converse proposition which aroused Judge Martin's fears. It has decided, that which he seems to instance as an absurdity, viz., that a note made in Mississippi that would, by our laws, be illegal for usury, will, if payable at Vidalia, nevertheless be good if it do not violate the laws of Louisiana. According to the meaning of this authority, then, this court must be driven either to abandon its former decisions, or else, by inevitable logical necessity, to decide, that the contract now in question is to be governed by the laws of New York, and is therefore void.

The Louisiana court was startled at what it supposed would be the consequences which would flow from this doctrine, one of which is stated to be, that local laws for the protection of minors, married women, and the improvident, would be rendered unavailing.

Judge Story (Confl. Laws, sec. 306) meets this objection by saying, that infants can, as he has shown, go to other States than that

which may be their domicile, and make binding contracts, because the laws of no State can have an extra-territorial operation. And that the principles of reciprocal justice and comity are best subserved by the adoption of the general rule, that the law of the place of contract and payment shall govern.

. But it may be said that this answer does not precisely meet the difficulty suggested, which is, that persons may come into Louisiana from other States, and draw infants and married women, &c., into contracts to be performed in jurisdictions where different rules on the subject of infancy and coverture obtain. If so, as the laws of the place of payment or performance are to govern, the laws of Louisiana, intended to protect such persons, might be rendered ineffectual.

But may not a sufficient answer be furnished by these two considerations ?—

1st. That such a contract by a Louisiana infant, made in that State, to be performed elsewhere, would, if made in fraud and evasion of the law of that State, be held void everywhere, in accordance with the doctrine of *Andrews* v. *Pond,* 13 Peters ; and *Brown* v. *Nevitt,* 27 Miss. R., above cited.

2d. By the comity of nations, would such a contract, made by a person under disability in Louisiana, to be performed beyond her limits, be held good? Has not every independent State the right to determine the *status* of its own citizens, and to regulate their abilities and disabilities while within its own limits? If, therefore, a case, such as that supposed, were to come in question in another State, might not its courts say, the party against whom this contract is sought to be enforced was, by the law of his own State at the time, disabled from making it? That being so, there being the want of the agreeing minds of two competent persons to make a binding engagement, there is, in fact, *no contract* existing on which our laws can operate. Again, both Judge Story and Judge Martin, and the writers whom they quote, seem to concur in the opinion that the *lex loci celebrati contractus* governs in all questions arising "as to the solemnities of the contract, its form and perfection." Is not the question, whether one of the parties was a minor, or otherwise incapable of contracting, one that goes directly to the making, the *perfection* of the contract itself? To admit that the local law

shall determine that question of competency, is evidently altogether different from allowing the same local law to determine whether the *act* agreed to be done, when the parties shall have reached New York, is legal or illegal.

But, were it held otherwise, there would scarcely be much room for complaint on the part of the Louisiana court, which has held that, if one who is a minor by the laws of his own country, but has reached the age of majority prescribed by the laws of Louisiana, goes into that State and makes a contract, it will be held good. *Saul* v. *His Creditors*, 17 Martin, R. 596, 598; Story, Conflict Laws, sec. 75, and note, sec. 76.

Lord Eldon held that, a contract made by an English minor in Scotland, would be governed by the laws of the latter country. 3 Espinasse, 163.

But, perhaps, the safest and the simplest rule, and the most easy of general application, is that which seems, without qualification, to obtain in the common law courts, that the law of the place of payment is, in all respects, to govern in accordance with the maxim of the Digest above cited: " Every one is understood to have contracted *in the place* where he has bound himself to pay."

Thus, in a case where goods were bought in Spain, to be delivered in England, and a written memorandum of the sale was required by the laws of the latter, and not by those of the former, the opinion seems to have been that the English Statute of Frauds applied. *Acibal* v. *Levy*, 10 Bing. R. 376. Cited Story, Conflict Laws, sec. 262, a, note.

I wish, again, to call attention to the fact, that the place of celebrating this contract with Brown, Brothers & Co., is not distinctly stated in their bill. Whereas, in the case of *Depau* v. *Humphreys*, it did appear that the contract was made in New Orleans.

Complainants had two places of business,—Liverpool and New York; that of the bank was Rodney, in this State. For aught that clearly appears, the contract may have been made in England, in New York, or Mississippi. But the inference against the complainants, from the ambiguous statements of their bill, is almost irresistible that the contract must have been made in New York. The letter of Lawton, the cashier of the bank, is filed with the bill, and referred to, as *evidence* of the new contract between the parties. But this letter is evidently written in reply to one received from

the New York house, which, it would appear, contained the proposition that the Browns should have credit with the bank for their indebtedness in New York, with the addition of £293 12s. 4d. for "transmission." This proposition is rejected; but the cashier proposes that 8⅜ per cent. exchange shall be added, which would create a credit to the account of the Browns of $169,247 37, to bear interest at 8 per cent. Now, if this letter is the evidence of the contract, where was it accepted? Where was the "final assent" to Lawton's proposition given? As the business, by complainants' own showing, was conducted by correspondence with the New York house, and as Lawton's proposition became the very contract of the parties now relied on, must not New York have been the place where the final act was done from which the contract emerged complete?

If so, what, in legal contemplation, was the place of the contract? The answer is, the place where the *final assent* was given. Confl. Laws, sec. 285; Burge, Surety, 75, 78.

But, if this be not so, if the place where the "final assent" is given is not in law the place of the contract, then, to make the best of the case for complainants, this contract was a mixed one, made partly in Mississippi and partly in New York, and to be referred wholly to the laws of neither as the "*locus celebrati contractus.*" In that point of view, we have no law definitely ascertained as applying to the case but the law of New York, the place of performance of the contract, and where the creditor resided. In the absence of a knowledge of the place of making a contract, is not the creditor's domicile presumed to be the *locus contractus?* 6 Paige, 630; 3 Green's N. J. Ch. R. 133.

And if the contract were, in fact, made in Mississippi, ought not that law, on broad principles of policy, to govern? If this contract, made to be performed in New York, is by the rules of international law to be held good here, it must also be a good contract in New York. For the general principle is, that contracts which are good at the place where made, according to its laws rightfully applied to them, are held good everywhere. But if this contract, usurious by the laws of New York, is valid, would not a contract made here, to do any other act in New York, not forbidden by the laws, however much it might violate the laws or declared policy of

that State, be equally valid ? If so, then the courts of New York may be led, by a general rule of international law, to sustain contracts, for the violation within her limits of any the most highly penal statute upon her statute books. This that court would be compelled to do, or else refuse to aid the execution of the contract, on the ground of its being prejudicial to her interests. But can that rule be just and salutary, or consist with comity or the reciprocal obligations of nations to deal justly with each other, which requires the courts of one State to uphold a contract made by its citizens to do an act in another, which the latter would be bound by the law of self-protection to reject as opposed to its laws and policy, and dangerous to its peace and repose ? Suppose a contract made by a citizen of this State in Tennessee for the purchase of slaves known to have been convicted of felony, to be delivered in Mississippi at a price there to be paid. Beyond all doubt, such a contract would be instantly declared void by any court in this State before which it might be drawn in question. But would not common decency require of a Tennessee court to decide likewise ? If the argument before it were, this contract was made in Tennessee, whose laws do not prohibit the sale and delivery of such property, and it is therefore valid, would not the answer be, " But it looked to Mississippi for its completion, and the laws of that State declare the *act* which is there to be done pernicious and dangerous in the extreme, and therefore forbidden."

Has not New York then a right to ask that persons beyond her limits shall not be allowed to contract to come within them to do acts which, apart from their repugnancy to her laws, might by force of example rouse the cupidity or other passions of her citizens, and incite them to a violation of their duties ? For she punishes offences not so much because of the injury that may be done in the particular instance, but with a view to the remote consequences of acts, and to deter other offenders. Evil example and immunity from punishment, as experience has proved, furnish an easy lure to entice the vicious to offend.

What distinction can be drawn between usury and other penal laws we find it difficult to perceive. The fact that such laws have a general existence amongst nations, seems to prove that they are founded in the common sense which mankind have of their justice.

And surely every independent nation has the right to determine for itself what the reasonable measure of interest shall be, and how far its own policy requires that penalties should be inflicted if that measure be exceeded. Certainly our laws do not discriminate, between contracts to do acts which are *mala prohibita*, and those which are *mala in se.* For the purpose of deciding whether an act be legal or otherwise, on what principle would we distinguish between the penal laws of another State ?

But it may be said, that by the universally admitted rule, the law of the place where the contract is made and to be performed is to govern it, the courts of New York may be called upon to enforce a Mississippi contract, which, if made within the limits of the former, would be repugnant to its laws. The answer is, the laws of every State are supreme within its own territory, and must control all acts to be done within their jurisdiction ; and the rule referred to is one of comity between nations, observed of necessity, for otherwise commercial intercourse between them would be greatly impeded, if not destroyed.

It is therefore, not without confidence, submitted, that the vice-chancellor did right in sustaining this demurrer, because—

1. By the decisions of this court, and the general consent of common law courts everywhere, with rare exceptions, if not by the common consent of nations, the rule is established, that they who make contracts in one country to be performed in another, necessarily refer them to the laws of the latter, as those by which they are to be governed.

2. Because it is consistent with justice that every nation shall have the right to determine whether acts agreed to be done within its limits accord with its laws and policy, and consist with the repose and good order of its society.

3. Because, as the interests of every government require that its own laws should be respected and observed, so should it yield respect to the laws of others, so far as may be consistent with its duties to its own citizens.

The only question remaining in the case, if it can be called a question, is whether Mr. Murdock, the trustee of the property of the bank, can make the defence that the contract is void for usury. He took by assignment, for the purpose of paying the bank's

debts. No debt can be called such which has not the sanction of law. If the contract from which the debt is inferred was void for illegality, of necessity no debt exists.

Debts barred by the Statute of Limitations are not revived by a trust created for the payment of debts. 2 Spence's Equity, 355, marg. page 357.

*A fortiori*, would such be the case with a contract void for illegality.

But this very point has been expressly decided. *Fulton Bank* v. *Beach*, 3 Wend. 573; *Pratt* v. *Adams*, 7 Paige, 642.

FISHER, J., delivered the opinion of the court.

This is an appeal from a decree of the Vice-Chancery Court, at Natchez, sustaining a demurrer to the complainants' amended bill. The facts which relate to the principal ground of demurrer, are as follows. The Commercial Bank of Rodney was, on the 30th of June, 1840, indebted to the complainants in a certain sum of money, payable in London; and, failing to make payment at the place appointed, payment was demanded of the bank at her place of business in this State. Not being able to comply with this demand, the bank proposed to make the debt payable in New York; and, in consideration of this change in the place of payment, and of forbearance by the complainants, it is alleged that she promised to pay interest on the debt at the rate of eight per cent. per annum, until it should be finally paid.

This proposition, ripening into a contract between the Commercial Bank of Rodney and the complainants, the question is, can the contract be enforced?

It is said, inasmuch as the money is, by the terms of the contract, payable in New York, it must be presumed that the parties contracted with reference to the laws of that State,—which declare all contracts reserving a higher rate of interest than seven per cent. void. The proposition made by the bank, being dated at her place of business in this State, the contract, for the purpose of considering the question argued by counsel, will be treated as one made in this State, to be performed in New York.

It will readily be perceived from the brief statement which has been made of the facts, that the main point to be settled is, whether

the parties had in view the laws of Mississippi or of New York, in consummating the contract. In considering this somewhat vexed question, we will not undertake to reconcile the various decisions made on the subject, and which, it may be admitted, cannot be easily made to harmonize. The difference in the decisions but accords with the views which different courts have entertained, as to the principle upon which they have based their opinions. One set of decisions is based upon an admitted doctrine, that the *lex loci contractus* controls the nature, construction, and validity of the contract, and that if it is valid by that law, it is equally so everywhere. 2 Kent. Com. 454. The other set of decisions rests upon another doctrine, which, with certain qualifications, may also be admitted,—that when a contract is made in one country, but to be performed in another, it must be presumed that the parties contracted with reference to the laws of the latter country. This, however, being but a presumption, must be controlled by the actual truth of the case, when ascertained; or, in other words, by the intention of the parties, to be collected from the contract itself, and all the surrounding circumstances. Let us inquire then, first, as to the intention of the parties. The debt was originally payable, not in New York, but in England; and up to the time of making the proposition, the bank had neither received any benefit, or been subjected to the performance of any duty under the laws of New York. The advantage sought by the proposed modification in the contract as to the time of payment was to accrue to her in this State, because, being the creature of our laws and located here, it was here that she would have been visited with the consequences of her default in failing to pay the debt according to contract in England. The laws of New York were as inoperative, and as ineffectual to afford the complainants an adequate remedy for the collection of their debt, as the laws of China would have been, if appealed to under the circumstances. The very object, therefore, sought by the forbearance, was to relieve the bank from the consequences which the laws of this State attached to her failure to perform her contract. It was here, that the complainants could, and doubtless would have pursued their remedy; and to avoid the consequences of such a proceeding, was the advantage which the bank expected to realize. The advantage then accruing here, it

is but fair to presume that she was willing, and intended to pay for such advantage what the laws of the State permitted the complainants to exact. Besides, the proposition, coming, as it did, from the bank, it may be presumed that her officers intended to contract with reference to those laws with which they were most familiar; and the proposition conforming to the laws of this State, we are bound to presume that it was so intended; and, in the absence of any averment to the contrary, we must presume that the proposition was accepted with the same intention with which it was moulded.

It is, therefore, our opinion that the parties intended the contract, so far as its nature, construction, and validity are concerned, to be governed by our laws and not by the laws of New York; and this narrows the controversy down to the single point,—whether the parties could so contract. We have seen that the advantages, expected to accrue to the bank, under the contract, were realized here, and, as the equivalent for such advantages, she undertook to pay no more than the law of the State permitted the complainants to exact.

The place of payment can and ought, upon principle, to make no difference, as the sole question on this part of the contract was, whether the creditors should seek payment from the debtor at her place of business in this State, or whether the debtor should go beyond the State and make payment to the creditors at a place designated, but different from that specified in the contract, which was to be modified. The law sanctions that which it does not prohibit; and certainly parties, for advantages or exemptions to be enjoyed here, may contract to pay therefor, to the extent that our law is not infringed in so doing; and the contract being valid here, why is it not equally so in New York? What law of that State dictated a rule of action to the parties in consummating their contract? None; for the reason that it was confined in its operation to transactions in the State, or to advantages to be there enjoyed. But the authorities settle this point. Chancellor Kent declares the general doctrine to be, that the law of the place where the contract is made is to determine the rate of interest, when the contract specifically gives interest. 2 Kent, 460. The interest being part of the substance of the contract, the only inquiry is, whether it is such

a stipulation as could be inserted therein without a violation of law; and the case of *Depau* v. *Humphreys*, 8 Martin R. 1, is full on this point. Whatever the rule at one time may have been, it is now settled, by the modern decisions, that when a contract is made in one country, stipulating for a rate of interest sanctioned by the laws of that country, it is valid, regardless of the laws of the country where it is payable, unless it shall appear that it was made with reference to the laws of the latter country. The presumption is never to be indulged that parties intended, in making their contract, to violate the law; and if there be two laws, with reference to either of which they may contract, and the contract accords with one of the laws, it must be presumed that the parties so intended, because they had their election to mould the contract according to either law; and, as the law presumes in favor of a contract, and not against it, the presumption must be that the parties had in view the law which will give full effect to their contract.

We are, therefore, of opinion that the contract, in this instance, being valid under the laws of this State, the court below erred in sustaining the demurrer and dismissing the bill.

It is again said that, as the debt was payable in England, the laws of that country must govern as to the rate of interest. We deem it only necessary to repeat what has been said, that the parties could, by a contract made in this State, modify the old contract, to the extent that they were not prohibited by our law from so doing. The bank desired to enlarge the time of payment, and our law permitted the complainants, without regard to the previous contract, to stipulate for interest at the rate of eight per cent. per annum, as the consideration or inducement of this new feature of the contract. The bank had her option either to perform the contract in England, or to make in substance a new contract here, to pay any rate of interest for the forbearance, which the law sanctioned.

It is also said that the bill should have made the other creditors of the bank parties to the bill. There is no allegation that there are any other creditors; and hence this question cannot arise on demurrer.

Decree reversed, demurrer overruled, and cause remanded for answer to amended bill in sixty days.