## VAN VLEET *et al. v.* SLEDGE *et al.*

## SLEDGE *et al. v.* VAN VLEET.

### (*Circuit Court, W. D. Tennessee.* August 9, 1890.)

1. NEGOTIABLE INSTRUMENTS—INDORSEMENT—EVIDENCE.

The testimony of a witness as to statements of the indorsers of a note in regard to the agreement under which the indorsement was made is inadmissible as hearsay.

2. SAME—REFORMATION OF CONTRACT—EVIDENCE.

Parol evidence is inadmissible to vary or explain an unconditional indorsement of notes, but is competent for the purpose of reforming the contract of indorsement.

3. SAME—ENTRY ON BOOKS OF ACCOUNT.

An entry on the books of the indorsers, charging the notes to the indorsees, and reciting, "All said notes transferred to them in part payment of their account, and indorsed by us, waiving protest," is not ambiguous, and the person who made the entry cannot construe it, or testify as to what was meant by the word "payment."

4. SAME—REFORMATION OF CONTRACTS.

A written contract will not be reformed unless a material mistake is shown by proofs that are full, clear, and decisive, free from doubt and uncertainty, and such as to entirely satisfy the conscience of the court.

5. SAME—LACHES.

Notes were indorsed and transferred in payment of an indebtedness, and at the same time an entry was made by the indorsers' book-keeper in their books to the effect that the indorsement was unconditional. Afterwards the indorsers went into voluntary liquidation, with complainants' testator as liquidating partner, and he had charge of the books until his death, four years after which, and nine years after the indorsement, complainants sought to reform the contract of indorsement by making it conditional. *Held*, that they were estopped on the ground of laches.

6. SAME—REFORMATION OF THE BOOK-ENTRY.

The entry in the indorsers' books, claimed by complainants to have been a written memorandum of a verbal agreement in regard to the indorsement, could not be reformed to show that the indorsement was conditional, where it was, without mistake, made to appear on the notes as unconditional; since the effect would be to put in writing a verbal understanding, to vary the written contract.

7. SAME—PAROL EVIDENCE TO VARY WRITTEN CONTRACT—RULE OF FEDERAL COURTS.

The federal court is not bound by the decisions of the state court of the state over which it has jurisdiction, allowing a parol agreement to limit the effect of a written contract, but will follow the contrary rule, as established in the federal courts.

8. INTEREST—RECOVERY OF USURIOUS INTEREST PAID.

Usurious interest alleged to have been received from a firm by one of the partners cannot be recovered from his representative by the representatives of the other partners, where it is neither alleged nor shown that the latter did not receive like interest.

9. SAME—LACHES.

A demand for such interest will be repelled on the ground of laches, where it is made 10 years after the affairs of the partnership have been amicably settled, and the accounts of the several partners, as between themselves, satisfactorily adjusted.

10. INTEREST—STATEMENT OF ACCOUNT—CONVENTIONAL INTEREST.

Where a statement of account is furnished by the debtor, charging himself with interest at the conventional rate, he thereby contracts to pay that rate, and cannot, after paying the amount, recover the interest on the ground that it was greater than the legal rate.

11. SAME—USURY.

The statute of Mississippi, making the legal rate of interest 6 per cent., and providing that "contracts may be made in writing" for the payment of 10 per cent., only prevents the recovery of more than 6 per cent, unless the contract is in writing, and does not give the right to recover back more than 6 per cent. voluntarily paid under a verbal agreement.

12. PRACTICE IN FEDERAL COURTS—LACHES.

The federal courts sitting in equity will decline relief where complainant has been guilty of laches, though his claim may not be barred by the statute of limitations of the state.

13. INTEREST—EVASION OF LAW.
　　It is not an evasion of the interest laws to have the purchase-money notes for land executed in the state where the land is situated, in order to gain a higher rate of interest than is allowed by the law of the state in which the contracting parties reside.

14. NEGOTIABLE INSTRUMENTS—LIABILITY OF INDORSER.
　　The extent of the liability of the unconditional indorser of a note is the face value of the note, and not the consideration received by him.

In Equity.

Complainants, as executrices of A. N. McKay, surviving partner of the firm of Sledge, McKay & Co., filed their bill in 1889 against William M. Sledge, as executor of W. M. Sledge, deceased, N. R. Sledge, W. D. Sledge, and O. D. Sledge, executors of N. R. Sledge, deceased, and as surviving partners of the firm of N. R. Sledge & Sons. The bill alleges that A. N. McKay, deceased, was the liquidating partner of Sledge, McKay & Co., which firm went into voluntary liquidation, and that all the debts of said firm had not been paid, and the prayer was for a receiver to settle up the affairs of the partnership, and that its creditors should come in and prove their claims. The bill also alleges that in and after 1873 N. R. Sledge & Sons exacted usurious interest on the balance it had to its credit with the firm of Sledge, McKay & Co.; that prior to January 29, 1880, N. R. Sledge & Sons had a large balance with Sledge, McKay & Co.; that the latter firm on that date was the holder of three promissory notes; that N. R. Sledge, acting for his firm, proposed to Sledge, McKay & Co. that he would take the notes in part payment of the balance due if Sledge, McKay & Co. would guaranty their payment in the event the title to the land on which they were secured, which was then in litigation, should fail; that the notes were thereupon indorsed and delivered in pursuance of the agreement; that the title to the land proved good, and that N. R. Sledge & Sons foreclosed their lien on the same, and that defendants threatened to bring suit against complainants for the deficit. The bill prayed, among other things, that complainants might be allowed to prove by parol that the indorsement on the notes referred to was conditional, as alleged, and that they might be allowed to set off against any claim of N. R. Sledge & Sons the usurious interest alleged in the bill to have been exacted by them. The indorsement on the notes was as follows: "Pay to the order of N. R. Sledge & Sons, waiving protest and notice. SLEDGE, McKAY & Co." Defendants answered the bill, denying the exaction of usurious interest, as alleged, or that the notes taken by N. R. Sledge & Sons from Sledge, McKay & Co. were indorsed conditionally, or that there was any parol agreement in reference to such indorsement. They alleged that the entire transaction was expressed in the written indorsement, and that it was intended to have its legal effect. The notes were indorsed in 1878. Defendants also filed a cross-bill, asking that complainants be charged with two-thirds of the balance due on the notes, after deducting the amount received from the sale of the land on which they were a lien. Complainants by an amended bill sought to charge defendants, as executors of N. R. Sledge, with usurious interest, alleged to have been received by him from the

firm of Sledge, McKay & Co., of which he was a member, as well as of the firm of N. R. Sledge & Co.

*Taylor & Carroll, T. H. Jackson*, and *Metcalf & Walker*, for Van Vleet et al.

*Beard & Clapp* and *C. F. Vance*, for Sledge et al.

JACKSON, J. The conclusions reached by the court on the questions presented in these causes, after a careful examination of the pleadings and proof, which it is not deemed necessary to set out and review in detail, are the following, viz.:

1. The exceptions of cross-complainants to the answer of witness A. N. McCollum to the fourteenth and fifteenth direct interrogatories and to the answer of witness W. M. Sledge to direct interrogatory 7, so far as they undertake to give the conversations or statements of A. N. McKay and W. M. Sledge, Sr., as to the contract or agreement under which the Rogers notes were indorsed by Sledge, McKay & Co. to N. R. Sledge & Sons, should be and are sustained, because said answers were only hearsay testimony, and incompetent. To the extent indicated, said answers are excluded as evidence. The exceptions of said complainants to the competency of the answers of witness J. W. Fulmer to the seventh, ninth, tenth, and thirteenth direct interrogatories are sustained so far as they attempt or undertake to vary or explain the written contract embodied in the indorsement made by Sledge, McKay & Co. upon the Rogers notes, transferred to N. R. Sledge & Sons. Parol evidence being incompetent to vary or explain said contract, said answers should be excluded for that purpose. But, so far as said answers have any bearing upon the question of reforming the contract of the parties sought to be effected by the amended bill, the statements of the witness are competent, and are allowed to stand as evidence upon that question. The exceptions of cross-complainant to the competency of said witness Fulmer's answers to the twenty-third and twenty-fourth direct interrogatories are sustained. The entry made by said witness upon the books of Sledge, McKay & Co., charging N. R. Sledge & Sons with the Rogers notes, with the accompanying memorandum, that "all said notes transferred to them in part payment of their account, and indorsed by us, waiving protest," was not ambiguous. Witness was not at liberty to construe it, nor was it competent for him to explain what was meant by the word "payment," or to give his understanding that, when a creditor accepted a note of a third party in absolute payment, he has no right to look to the indorser of such note. These answers are incompetent, and should be excluded.

2. The amended bill to reform the contract between Sledge, McKay & Co. and N. R. Sledge & Sons, under which the Rogers notes were transferred by the former to the latter, cannot be sustained, because the evidence is insufficient to warrant such relief, and because complainants and McKay, the surviving partner of Sledge, McKay & Co., to whose rights they have succeeded, have unreasonably delayed their application to reform said contract, and should now be repelled on the ground of

"laches," if the proof was even more satisfactory than it is that the indorsement of the notes, and the entry upon the books of Sledge, McKay & Co., did not embody or express the real contract and agreement of the parties. The casual conversations which E. A. Spottswood and W. M. Sledge detail as having occurred with cross-complainant N. R. Sledge are entitled to but little consideration as evidence on which to reform a written contract; but, so far as they have any weight, they are fully counter-balanced by the testimony of N. R. Sledge and N. Norfleet,— the latter being a disinterested witness,—whose evidence tends to show that A. N. McKay in his life-time, and shortly before his death, recognized the liability of Sledge, McKay & Co. upon their indorsement of the Rogers notes, or that said firm was liable to the surviving partners of N. R. Sledge & Sons on said notes. The alleged statements of N. R. Sledge, as given by Spottswood and W. M. Sledge, being fully offset by the testimony of N. R. Sledge and Norfleet, the case for the reformation of the contract under which the notes were transferred depends upon the evidence of J. W. Fulmer, which is insufficient for that purpose. Equity will reform written instruments, so that they shall conform to the precise intent of the parties to them, when a material mistake is shown by proofs that are full, clear, and decisive, free from doubt and uncertainty, and such as to entirely satisfy the conscience of the court. Fulmer's testimony falls far short of this standard. After stating that the Rogers notes were transferred in part payment of the large debt which Sledge, McKay & Co. owed to N. R. Sledge & Sons, he is asked if there was any agreement or understanding as to the liability that Sledge, McKay & Co. came under by virtue of their indorsement of said notes, to which he replies:

"Only this liability: that the property for which the notes were given was in litigation at the time, and, in case Sledge, McKay & Co. failed to gain the litigation, then, and in that event, they were liable on their indorsement, but otherwise were not liable."

He says, further, that N. R. Sledge and A. N. McKay both stated the "proposition" to him together, and authorized him to make the entry and complete the transaction; that they directed him to enter upon the books of Sledge, McKay & Co. the entire transaction and agreement, which, however, he did not do; that it was not customary to enter contracts on the books in making journal entries further than to state the object of the entry; and that he had no object in leaving out the special agreement in the entry which he made of the transaction. Now, by reference to Fulmer's answer to the twenty-third and twenty-fourth direct interrogatories, it will be seen that his understanding at the time was that, as the notes were taken in absolute payment, N. R. Sledge & Sons could look only to the makers thereof, and not to the indorsers. Entertaining this idea, he supposed that Sledge, McKay & Co. incurred no liability by their indorsement of said notes, inasmuch as they were accepted by N. R. Sledge & Sons in part payment of their debt; and, as something may have been said about the indorsers guarantying the title to the land, which was a material part of the security for the pay-

ment of the notes, it is more than likely that Fulmer has confused the latter with his idea or understanding that their indorsement of the notes imposed no liability upon Sledge, McKay & Co., because the notes were taken by N. R. Sledge & Sons in absolute payment of part of their debt. Having this idea as to the effect of the indorsement, it was quite natural for Fulmer to suppose, from something that may have been said about the title to the land, that the liability of Sledge, McKay & Co. was limited to a guaranty of that title. According to Fulmer's understanding at the time of the transaction, and of the effect of the entry made by him on the books of Sledge, McKay & Co., the latter's indorsement of the notes imposed no liability upon them, and yet he now says that the parties agreed and directed him to make an entry to the effect that said indorsement should impose a liability upon the indorsers only in the event the title failed. This must have struck him as something remarkable, if it occurred in that way; but, instead of making the entry of any such agreement, he neglected to do so, for the reason that it was not customary. Nine years after the transaction, and after failure to make the entry as directed, it is now proposed, by and upon his indistinct and general recollection of what was said,—whether before or after the indorsement was actually made does not appear,—to correct his entry. His testimony fails to satisfy the court that this should be done. The action of the indorsers informally waiving protest and notice is inconsistent with the theory now advanced, or with Fulmer's understanding that Sledge, McKay & Co., by and under their indorsement, were to incur no liability for the failure of Rogers to pay the notes, but only became liable to make good the title to the land. If the latter was their sole undertaking, why waive protest and notice of the non-payment of the notes? Business men of experience would hardly so act.

But if the proof of the alleged agreement to qualify and limit the legal effect of Sledge, McKay & Co.'s indorsement upon the notes, so as to make their liability thereon dependent upon the failure of the title to the land, was even clearer and more satisfactory than it is, still the complainants should be denied the relief sought by their amended bill, of having the contract reformed, under the circumstances of this case, on the ground of "laches." Their amended bill, seeking a reformation of the contract, was filed more than nine years after the transaction. No satisfactory explanation is given for the delay. Complainants' testator, A. N. McKay, was the liquidating partner of Sledge, McKay & Co. He had the books of the firm in his possession up to the date of his death, in December, 1885, and, if he did not actually inspect the entry of the transaction upon those books as made in January, 1880, he could have done so. It is not shown that he did not inspect and know of the entry as it was actually made by Fulmer. It must be presumed that he did know of it, and there is no evidence that he ever complained of its incorrectness. His clerk, McCollum, who, after his death, became the agent of his estate for the complainants, was informed of the alleged agreement at or about the time it was made. So was W. M. Sledge, the executor of W. M. Sledge, Sr. If A. N. McKay had survived and

filed the amended bill to reform said contract as late as February 20, 1889, and after the death of the other parties to the transaction, he would clearly have been repelled on the ground of *"laches."* With all the facts easily accessible to them, the complainants, as his personal representatives, stand in no better position. The well-settled rule of the supreme court is that parties seeking such relief must be diligent in the assertion of their rights. In *Badger* v. *Badger*, 2 Wall. 95, the rule laid down and repeatedly reaffirmed is that the party who appeals to the conscience of the chancellor in support of a claim, where there has been laches in prosecuting it, or long acquiescence in the assertion of adverse rights—

"Should set forth in this bill specifically what were the impediments to an earlier prosecution of his claim, how he came to be so long ignorant of his rights, and the means used by the respondent to fraudulently keep him in ignorance, and how and when he first came to a knowledge of the matters alleged in his bill; otherwise, the chancellor may justly refuse to consider his case, on his own showing, without inquiring whether there is a demurrer or formal plea of the statute of limitation contained in the answer."

The principles laid down in other cases fully sustain the objection of laches in this case. See *Marsh* v. *Whitmore*, 21 Wall. 184; *Haywood* v. *Bank*, 96 U. S. 618; *Godden* v. *Kimmell*, 99 U. S. 201; *Landsdale* v. *Smith*, 106 U. S. 391, 1 Sup. Ct. Rep. 350; and *Richards* v. *Mackall*, 124 U. S. 183, 8 Sup. Ct. Rep. 437. But, aside from the objections of laches, and the insufficiency of the evidence to justify the relief sought, there is another difficulty in this branch of the case. The complainants do not allege either in their original or amended bill that there was any mistake in the indorsement which Sledge, McKay & Co. placed upon the Rogers notes, or that said indorsement was not in conformity with the intention of the parties. The claim is that, while there was no mistake in the indorsement itself, as made, there was a contemporaneous collateral agreement explanatory thereof, and limiting its operation and legal effect to a contingent liability of the indorsers, depending, not upon the failure of the makers to pay the notes at maturity, but upon the failure of title to the land on which the notes were a lien, which agreement was intended to be reduced to writing, but which Fulmer, the book-keeper, omitted or neglected to enter upon the books of Sledge, McKay & Co., as he was directed to do. The object of the amended bill is to have the entry which Fulmer actually made of the transaction on the books of Sledge, McKay & Co., in January, 1880, so reformed as to embody the alleged collateral explanatory agreement, to the end that the reformed entry may be used to control the legal effect of the indorsement upon the notes, and limit and confine its operation to a mere guaranty on the part of the indorsers of title to the Red Fork tract of land, for which Rogers executed the notes which were transferred. Such an attempt to reform an entry made in the books of the indorsers, in order to make it limit and qualify this contract of indorsement upon commercial paper, is a novel proceeding. It is an ingenious effort to provide written evidence by which to explain and vary the contract of indorse-

ment. In substance and effect it is an application to the court to compel the parties to put an alleged collateral verbal understanding in writing, so that it may be used as evidence in explaining and qualifying their formal written contract. The entry on the books of Sledge, McKay & Co., as it stands, is only evidence of the transaction. Suppose it should be reformed, as desired, its effect and operation would still be merely written evidence of the transaction. In my examination of this question, I have found no authority for entertaining a bill merely to provide written evidence, or to put evidence in such legal shape as will enable a party to use it in controlling a written contract. In the indorsement made by Sledge, McKay & Co., no mistake is alleged or shown. This court cannot aid complainants in providing written evidence by which to explain that indorsement. If the agent of the indorsers neglected to make such an explanatory written entry of the transaction as complainants now seek to have made by reforming the entry in the books of Sledge, McKay & Co., the latter must bear the consequence of such neglect. No reformation of the contract of indorsement made by Sledge, McKay & Co. can be had under the amended bill, and that relief is accordingly denied complainants.

3. The next position of the amended bill, that, as the indorsement of the notes was made in Tennessee, where a parol contract limiting the liability of an indorser of negotiable paper is valid between the immediate parties, and may be shown by parol evidence, this court should recognize and enforce such law of Tennessee as part of the contract of indorsement, is equally untenable. It is well settled that the federal courts are not bound by state decisions upon questions of general commercial law. *Swift* v. *Tyson,* 16 Pet. 1; *Oates* v. *Bank,* 100 U. S. 239; *Railroad Co.* v. *National Bank,* 102 U. S. 31; and *Liverpool Steam Co.* v. *Phenix Ins. Co.,* 129 U. S. 443, 9 Sup. Ct. Rep. 469. It is equally well settled in the federal courts that parol evidence of an oral agreement, alleged to have been made at the time of the drawing, making, or indorsing of a bill or note, cannot be permitted to vary, qualify, or contradict the terms of the written contract. *Specht* v. *Howard,* 16 Wall. 564; *Forsythe* v. *Kimball,* 91 U. S. 291; *White* v. *Bank,* 102 U. S. 658–661; and *Martin* v. *Cole,* 104 U. S. 31.

4. The recovery sought by the amended bill against the estate of N. R. Sledge, and for $3,701.21 of alleged usurious interest received by said Sledge from the firm of Sledge, McKay & Co., cannot be sustained, because it is neither stated in the pleadings nor shown in the evidence that the other members of Sledge, McKay & Co., including complainants' testator, A. N. McKay, were not paid, or did not receive equal amount of usurious interest from said firm, because the demand is stale, and, if not actually barred by the statute of limitations of both Tennessee and Mississippi, should be now repelled on the ground of laches. The firm of Sledge, McKay & Co. was dissolved by voluntary liquidation in 1878. Its affairs were amicably settled, and the accounts of the several members with the firm and as between themselves were adjusted to their mutual satisfaction. To open their settlements now, under a bill

filed 10 years after the last installment of usurious interest was allowed to one of the members, and to overhaul his settled interest accounts with this firm back to 1874, is not warranted by sound principle or authority. In *McKnight* v. *Taylor*, 1 How. 168, the supreme court say:

"That in matters of account, when they are not barred by the act of limitations, courts of equity refuse to interpose after a considerable lapse of time, from considerations of public policy, and from the difficulty of doing entire justice when the original transactions have become obscure by time, and the evidence may be lost."

Conscience, good faith, and reasonable diligence are required to call into active exercise the power of a court of chancery in such cases. This court will not, at this late day, even if N. R. Sledge's estate was not fully protected both by the six and seven years' statutes of limitation, after the partners themselves have acquiesced in the firm's paying interest in excess of 6 per cent. to one or all its members, open up the account of said firm with a view of ascertaining how much usurious interest each member has received. This claim of the amended bill is accordingly denied.

5. Complainants cannot require the firm of N. R. Sledge & Sons, or the surviving member thereof, to refund the interest in excess of 6 per cent. received from Sledge, McKay & Co., amounting, as alleged, to $7,264.49, for several reasons: (1) Because by the law of Mississippi, where N. R. Sledge & Son did business, and its members resided, and where the indebtedness of Sledge, McKay & Co. was payable, a conventional rate of interest in excess of 6 per cent. was allowed. The statute, after specifying the rate of interest in the absence of any convention or agreement, further provides: "But contracts may be made in writing for the payment of a rate of interest as great as ten per cent. per annum." In the mutual accounts between Sledge, McKay & Co. and N. R. Sledge & Sons, commencing in August, 1872, interest at the rate of 10 per cent. seems to have been charged on each side up to September 1, 1875, resulting in a balance of interest in favor of N. R. Sledge & Sons of $3,320.66, which was entered up to their credit, and they were furnished by Sledge, McKay & Co. with a written statement of the account between the firms, showing such rate of interest, and the amount due N. R. Sledge & Sons, including such balance of interest in their favor. This stated account by Sledge, McKay & Co., the debtors, rendered in writing to the creditor, and showing upon its face the interest credited to the latter at the rate of 10 per cent., was equivalent to, or, in legal effect, the same as, a contract in writing for the payment of such rate of interest up to that date. When a creditor renders an account to his debtor which the latter assents to as correct, either expressly or by implication of law from the failure to object thereto within a reasonable time, it becomes a stated account, which the debtor can ordinarily impeach or open only for fraud or mistake when sought to be held for the balance shown. An account stated is a new contract. The party against whom the balance stands is regarded as promising to pay that balance, not the particular items which enter into it. Hence inquiry on

his part into those items is not permitted unless fraud or mistake is shown. Such being the settled rule, when the creditor renders the account, which is received by the debtor without objection, it manifestly applies with greater force when the debtor states the account. In the latter case it is a written acknowledgment of his contract liability to pay the balance shown, including all the items of indebtedness therein, whether made up of principal or interest. It has in such case all the force and effect of a promissory note, embodying the rate of interest specified therein, and meets the requirement of a statute that a contract may be made in writing for the payment of such rate of interest. The statute of California provides that, "when there is no express contract in writing fixing a different rate of interest, interest shall be allowed at the rate of ten per cent. per annum;" and, further, that "parties may agree in writing for the payment of any rate of interest whatever, on money due or to become due on any contract." In *Pratolongo* v. *Larco*, 47 Cal. 378, it was held that accounts stated between the parties, as in the present case, showing the rate of interest charged at $1\frac{1}{2}$ per cent. per month, constituted an agreement in writing, which fully complied with the requirement of the statute. That case is directly in point here, for there is no substantial difference in the California and Mississippi statutes, except as to the rate of interest which may be stipulated for. An "agreement in writing," under the California statute, is the same in legal effect as a contract in writing under the Mississippi statute. Interest was credited by Sledge, McKay & Co. to N. R. Sledge & Sons on monthly balances and accounts rendered from September 1, 1875, to September 1, 1876, and from September 1, 1876, to September 1, 1877. From September 1, 1877, to September 1, 1878, the rate of interest was reduced to 8 per cent. But the account was regularly stated and rendered by Sledge, McKay & Co. to N. R. Sledge & Sons, showing the balances and the rate of interest allowed, so that all the interest allowed and agreed to be paid by debtor firm in excess of 6 per cent. up to September 1, 1878, was covered by the written contracts and agreements of Sledge, McKay & Co. to pay the same, within the provision of the Mississippi statute, and was not therefore usurious. From September 1, 1878, to date of final settlement of the balance due N. R. Sledge & Sons only 6 per cent. interest was charged and collected by the latter, and of course no question can arise as to interest during that period.

But aside from the fact that the stated accounts bring the rate of interest received within the Mississippi statute, there is another view of the question which is sufficient to defeat complainants' right to have the interest in excess of 6 per cent. refunded. Under the Mississippi statute no more than 6 per cent. can be recovered by action, unless the contract for the payment of a greater rate is in writing. The statute does not prohibit or make illegal the paying or receiving of a greater rate of interest than 6 per cent. unless the contract is in writing. Under such circumstances, when interest is paid in excess of 6 per cent., it cannot be recovered back if the payment was voluntary. This was so reached in the well-considered case of *Marvin* v. *Mendell*, 125 Mass. 562, which

turned upon the statutes of Massachusetts, almost identical with that of Mississippi. The court held that, while the conventional rate could not be enforced unless the contract was in writing, still without a written contract it was lawful to pay and receive a greater rate than 6 per cent., and that when voluntarily paid it could not be recovered back. To the same effect is the case of *Marye* v. *Strouse*, 5 Fed. Rep. 483. If the foregoing positions were not fatal to the claim to have N. R. Sledge & Sons refund the $7,264.49, of alleged usurious interest, this court would still hesitate, on the ground of long acquiescence, delay, and laches, to open the accounts between said firms reaching back to August, 1872, and overhaul them, so as to eliminate usurious interest charged and received on both sides. Nor would this court, in the consideration of that question, feel itself bound by the exceptions contained in the Tennessee statutes of limitations as to the non-residents of the state. In action at law the federal courts, sitting within a state, recognize and give effect to the statute of limitations. Section 34, judiciary act of 1789. *Amy* v. *Dubuque*, 98 U. S. 470; *Bank* v. *Lowery*, 93 U. S. 72. But there is a defense peculiar to courts of equity founded on lapse of time and the staleness of the claim. In such case the equity side of the federal courts will often refuse to interfere, even though the statute of limitations has not barred the claim. It should, I think, decline to act or afford relief in a case like the present.

6. The proof establishes that the Rogers notes were executed with reference to the laws of Arkansas, and that the rate of interest stipulated therein to be paid after the maturity was lawful. The situation of the parties, the dating of notes at Red Fork, Ark., and the presumption of the law that they intended to make a legal transaction, satisfies the court that the contract as to rate of interest had reference to the law of Arkansas. McCollum states the matter too strongly when he says it was intended to evade the law of Tennessee. It was certainly intended to obtain the Arkansas, rather than the Tennessee, rate of interest. That intention was no violation or evasion of the law of Tennessee. *Cromwell* v. *Sac Co.*, 96 U. S. 51; *Kellogg* v. *Miller*, 13 Fed. Rep. 198, (which is directly in point;) *Brown* v. *Freeland*, 34 Miss. 214.

7. The liability of Sledge, McKay & Co., as indorsers, to N. R. Sledge & Sons is for the full amount of the three unpaid Rogers notes, after crediting the same with the proceeds of land, amounting to $8,250, as of date November 19, 1886. This question has given the court the most difficulty in reaching a satisfactory conclusion. The extent of an indorser's liability to his immediate indorsee is, by the Tennessee decision, limited to the consideration received by the indorser, with 6 per cent. interest, both in respect to real transactions, as well as to accommodation paper. *May* v. *Campbell*, 7 Humph. 450. In *Nichols* v. *Fearson*, 7 Pet. 103, the question as to whether an indorsee could recover from his immediate indorser more than the consideration paid the latter was reserved. It does not appear to have been since directly passed upon by the supreme court. In *Tilden* v. *Blair*, 21 Wall. 241, and *Railroad Cos.* v. *Schutte*, 103 U. S. 145, there are expressions by the court

tending to show that the rule is that the indorsee may require the indorser to pay what the maker undertook to pay. In *Bank* v. *Johnson*, 104 U. S. 271, Mr. Justice MATTHEWS, speaking for the court, seems to limit the indorsee's right to recover against the indorser to the amount advanced to the latter, and interest thereon. He certainly states that as the rule in New York. Whether it was intended to adopt it as the rule of the supreme court does not clearly appear. It is laid down in 2 Parsons on Bills & Notes, (page 428,) that the indorsee may recover against his indorser the full amount of the note, especially in the case of real transaction paper. See, also, 1 Daniel, Neg. Inst. §§ 757, 767. There is great diversity of ruling in the state court on the point. After consideration of the question, the conclusion of this court is that the better reason and sounder principle are found in the rule which makes the indorser liable for the face of the note, where no usury is involved in the contract of indorsement, as in the present case. The legal undertaking of the indorser is that he will pay the note if the maker fails to do so at maturity, upon proper demand made and notice of such failure given, when not waived. When he passes the title to the paper to an indorsee for value with this undertaking, the sounder view seems to be that the indorser renders himself liable for the face of the note or bill. It is accordingly so ruled in this case, and the firm of Sledge, McKay & Co. will be charged in favor of N. R. Sledge & Sons, or the surviving member thereof, with the full amount of the three unpaid Rogers notes, after crediting said notes with the proceeds of the land sale, $8,250.01, as of date November 19, 1886, and at the rate of interest therein specified, viz., 8 per cent., till paid. It follows that cross-complainants are entitled to a decree on their cross-bill against the estate of A. N. McKay and W. M. Sledge for two-thirds of the balance due and unpaid on said Rogers notes, ascertained on the basis stated, and a decree will be accordingly so entered, with an allowance of costs to said cross-complainants in both the original and cross-suits. The complainants are denied any relief under their original or amended bill against the executor of N. R. Sledge, deceased, except to charge them, as such executors, with one-third of the Rogers notes, or one-third of the balance due thereon. They are entitled to no relief as against the firm of N. R. Sledge & Sons, or the surviving member thereof. Complainants' amended bill will be dismissed, with costs. Their original bill may be retained, if they so elect, to proceed thereunder to settle up any outstanding liabilities and business of Sledge, McKay & Co. If retained for that purpose, a reference will be directed to the master to ascertain and report any unpaid debts and undistributed assets of said firm. Such reference need not include the liability to cross-complainants on the Rogers notes, which is fixed, and the amount thereof easily ascertainable by simple computation. Complainants will be taxed with the costs in the cause already and hereafter to accrue.

Let decrees be entered accordingly.